UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| MARK IV TRANSPORTATION & LOGISTICS, INC., *Plaintiff*, v. USA GLOBAL LOGISTICS, LLC; JIM GINERIS, *Defendants*. | 25-cv-4096 (MEF)(SDA) **OPINION and ORDER** |

**Table of Contents**


I. Background
  A. The Parties
  B. The Allegations
  C. Procedural History
  D. The Motion
II. Law
III. Breach of Contract
  A. Trips
    1. Related
    2. Purposeful Availment
  B. The Phone Call
    1. A New Jersey Contact?
    2. A Contact for the Breach of Contract Claim?
      a. Related
      b. Purposeful Availment
  C. Conclusion
IV. Other Claims
V. Conclusion

* * *

A trucking company did some hauling for a logistics firm, but it came to believe that the logistics firm and its CEO were not following through on some promises they had made.

So the trucking company sued each of them, including for breach of contract.

The CEO has now moved to dismiss, arguing that the Court does not have personal jurisdiction over him.

The motion is denied in part and granted in part.

* * *

## I. Background

### A. The Parties

There are three main players here.

First is a logistics company.[1] See Amended Complaint and Jury Demand ("Complaint") ¶ 3.

It operates as a kind of broker, matching up its customers with a delivery option. Say a clothing manufacturer needs to get a pallet of shirts to a particular department store, the logistics company works to find a delivery company --- and then arranges with the delivery company to get the shirts moved from the warehouse and dropped off curbside. See id.; Certification of Gerald Giampaglia ("Giampaglia Declaration") (ECF 35-2) ¶¶ 3, 10-12.

The second main player is the logistics company's CEO.[2]

Florida is his home base. He lives there and owns property there. And he does most of his work from there, too. See Defendant Jim Gineris' Declaration in Support of Motion to Dismiss Plaintiff's Amended Complaint ("Gineris Declaration") (ECF 32-2) ¶¶ 2, 10.

Third and finally --- a trucking company.[3]

---

[1] USA Global Logistics, LLC.

[2] Jim Gineris.

[3] Mark IV Transportation & Logistics, Inc.

In the past, it had worked with the logistics company. Delivering, for example, shoes to one of the logistics company's clients in New Jersey. See Giampaglia Declaration ¶¶ 3, 10. And in another corner of the state, delivering makeup for another logistics-company client.[4]

The trucking company is incorporated and headquartered in New Jersey. See Complaint ¶ 2; Giampaglia Declaration ¶ 6. And it seems to be mainly a local operation --- doing most its delivery work in New Jersey.[5] See Giampaglia Declaration ¶ 6; Invoices at 117-122.

## B. The Allegations

In early 2025,[6] the logistics company and the trucking company were working together in their usual way.

The logistics company had called about a delivery job for one of its clients, a makeup company, and the trucking company got going --- its trucks were loaded up, its drivers headed out to deliver the makeup. See Invoices at 117-122; Complaint ¶ 9.

But a problem developed.

The logistics company owed money for the trucking company's work. Yet the payments were only trickling out; they were slow, and eventually they stopped altogether. See Complaint ¶¶ 9, 18-32; Exhibit C to the Brief in Support of Plaintiff's Opposition to Defendant's Motion to Dismiss ("March Emails") (ECF 35-5) at 15-17.

In the midst of all this, the logistics company's CEO said he would personally cover what his company still owed the trucking

---

[4] See Giampaglia Declaration ¶ 3; Exhibit D to the Brief in Support of Plaintiff's Opposition to Defendant's Motion to Dismiss ("Invoices") (ECF 35-5) at 117-122. Sometimes, the trucking company also picked up products in New Jersey and transported them to other states. See Invoices at 180-193. Vice-versa, too. See id.

[5] "Mainly" local because the trucking company has satellite offices in four other states. See Exhibit C to Defendant Jim Generis' Brief in Support of His Motion to Dismiss Plaintiff's Amended Complaint ("Interrogatories") (ECF 32-4) at page 6.

[6] The allegations here are just that --- allegations. Whether they are in fact true --- that will be a question for later.

company on certain makeup delivery jobs. See Complaint ¶¶ 9, 33; Interrogatories at pages 3-4.

With that guaranty made,[7] the trucking company kept delivering makeup for the logistics company's client. See Complaint ¶¶ 9, 19, 33.

But in the end, no payments ever came through --- from the logistics company, or from the CEO who had made the guaranty. See id. ¶ 19.

### C. Procedural History

In light of the above, the trucking company sued the logistics company. See id. ¶¶ 18-32, 42-49. And, more importantly for this Opinion and Order, it sued the logistics company's CEO --- for violating the personal guaranty he is said to have provided. See id. ¶¶ 33, 42-49.

From here, the trucking company/plaintiff is called "the New Jersey Company." The CEO/defendant is referred to as "the Florida CEO." And the logistics company/defendant is "the Logistics Company."

### D. The Motion

Earlier, the Florida CEO moved to dismiss for lack of personal jurisdiction. See Notice of Defendant's Jim Gineris' Motion to Dismiss Plaintiff's Complaint (ECF 10).

The Court denied that motion without prejudice, to allow jurisdictional discovery. See Opinion and Order (ECF 28).

The parties worked through that discovery. See Joint Jurisdictional Discovery Order (ECF 31).

And the Florida CEO has now moved again to dismiss on no-personal-jurisdiction grounds. See Notice of Defendant Jim Generis' Motion to Dismiss Plaintiff's Amended Complaint (ECF 32); Defendant Jim Generis' Brief in Support of His Motion to Dismiss Plaintiff's Amended Complaint ("Defendant's Brief") (ECF

---

[7] A guaranty is a contingent promise to pay. A back-up commitment to fork over money if another entity, closer to the front of the line, does not make its payment.

31-1); Defendant Jim Generis' Reply Brief in Support of His Motion to Dismiss Plaintiff's Amended Complaint ("Defendant's Reply Brief") (ECF 36).

The motion is before the Court.

* * *

In considering the motion, start with the governing legal principles. See Part II.

Then apply those principles to the key claim here --- that by not stepping up as the alleged guaranty required, the Florida CEO breached a contract he had made. The Court's conclusion: there is personal jurisdiction over the CEO as to that claim. See Part III.

And there is jurisdiction, the Court concludes, over the Florida CEO on most of the other claims here, too. See Part IV.

## II. Law

A court's jurisdiction over a defendant (like the Florida CEO) who lives in a different state is limited by the law of the state where the court sits. See Fed. R. Civ. P. 4(k)(1)(A); Daimler AG v. Bauman, 571 U.S. 117, 125 (2014).

Here, that means New Jersey law --- and under New Jersey law, jurisdiction over a non-New Jersey defendant reaches as far as the United States Constitution allows. See Charles Gendler & Co. v. Telecom Equip. Corp., 102 N.J. 460, 469 (1986); N.J. Ct. R. 4:4-4; Miller Yacht Sales, Inc. v. Smith, 384 F.3d 93, 96 (3d Cir. 2004).

Under the Constitution, a court can get personal jurisdiction over an out-of-state defendant in one of two ways --- via general jurisdiction or via specific jurisdiction. See Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct., 592 U.S. 351, 358 (2021).

In this case, only specific jurisdiction has been put on the table. See Brief in Support of Plaintiff's Opposition to Defendant's Motion to Dismiss ("Plaintiff's Brief") (ECF 35) at 8-17.

So zero in there.

For there to be specific jurisdiction over an out-of-state defendant, a three-part test needs to be passed.

> First, the defendant must have purposefully directed [his] activities at the forum. Second, the litigation must arise out of or relate to . . . those activities. And third, if the prior two requirements are met, a court may consider whether the exercise of jurisdiction otherwise comport[s] with fair play and substantial justice.

O'Connor v. Sandy Lane Hotel Co., 496 F.3d 312, 317 (3d Cir. 2007) (cleaned up).

In assessing all of this, the analysis varies a bit based on the nature of the underlying claim. Whether it is, say, a tort claim or a contract claim. See generally Danziger & De Llano, LLP v. Morgan Verkamp LLC, 948 F.3d 124 (3d Cir. 2020).

Here, the main claim[8] against the Florida CEO is for breach of contract. See Complaint ¶¶ 42–49. He allegedly gave a guaranty.[9] See id. ¶ 33. And he broke it. See id. ¶ 19.

So to decide whether the three-part test set out above is met, the Court looks to the specific-jurisdiction caselaw that has been developed for contract cases.

Applying that body of law to the breach of contract claim against the Florida CEO is the work of the next Part.

## III. Breach of Contract

The New Jersey Company is the plaintiff here, so it has the burden of establishing jurisdiction. See Patterson ex rel. Patterson v. FBI, 893 F.2d 595, 603–04 (3d Cir. 1990). It can do that at this stage by coming forward with evidence --- documents, sworn testimony, etc. See id.

---

[8] "Main claim" because there are other claims against the Florida CEO here, too. As to those, see Part IV. Aside from what is set out in Part IV, the Court's analysis in this Opinion and Order only concerns the breach of contract claim. See Complaint ¶¶ 33, 42–49.

[9] A guaranty is a kind of contract. Cf. Mellon Bank (E.) PSFS, Nat. Ass'n v. Farino, 960 F.2d 1217, 1223–24 (3d Cir. 1992).

Here, the New Jersey Company points to evidence of two things. Of the Florida CEO's trips to New Jersey. And of the phone call where the CEO allegedly offered his guaranty.

Take these up below, each in turn --- the trips and the call.

### A. Trips

The Florida CEO traveled to New Jersey three times. Around ten years ago, around eight years ago, and about six years ago. See Deposition of Jim Gineris ("Generis Deposition")[10] (ECF 35-3, 36-1) at 19:18-20:25, 24:1-25, 31:1-32:25, 39:1-25, 41:1-14; Giampaglia Declaration ¶¶ 5-7.

During each trip, he stopped by the New Jersey company's headquarters/facilities. See Gineris Deposition at 19:24-20:3.

Trip one was in 2015.[11]

The Florida CEO, acting for his Logistics Company, met the New Jersey Company's executives for the first time. See id. at 19:24-20:3, 31:1-14. They sat down to consider doing some business together. See id. And things worked out --- sometime after the first meeting, the Logistics Company hired the New Jersey Company to start making deliveries for it. See Giampaglia Declaration ¶¶ 3-14.

Trip two was in 2017.

The Florida CEO came back on another visit to the New Jersey Company's facilities. This time to discuss some specific topics --- sneaker deliveries and industrial-equipment deliveries. See Gineris Deposition at 31:18-32:2.

---

[10] The parties filed different excerpts from the same deposition. See Exhibit B to Plaintiff's Brief (ECF 35-5) (portions of pages 19-94); Exhibit 1 to Defendant's Reply Brief (ECF 36-1) (page 1 and portions of pages 56-96). The Court refers to these excerpts, collectively, as the "Gineris Deposition" and cites to the deposition transcript's page and line numbers.

[11] The year provided for each trip is an estimate based on the date of the Florida CEO's deposition (December 2025) and how many years back from that date he said that the trip in question took place.

Trip three, in 2019, was specific again.

The Logistics Company had landed a new client --- a makeup company, Sephora. The Florida CEO was thinking about looking to the New Jersey Company to make its local Sephora deliveries. See id. at 20:8-11; 39:3-9. But before getting underway, Sephora wanted to make sure that the New Jersey Company had solid security measures in place. See id. at 39:5-9. So the Florida CEO and a Sephora executive went together to check out the New Jersey Company's facilities. See id. at 20:8-11, 39:3-9; Interrogatories at page 6. The Sephora executive was satisfied, and in light of that --- and for years to come --- the Logistics Company would often arrange for the New Jersey Company to make its New Jersey Sephora deliveries.[12] See Complaint ¶¶ 9, 11; Giampaglia Declaration ¶ 3; Invoices at 117-193.

* * *

Do the Florida CEO's three trips to New Jersey push in favor of exercising jurisdiction over him?

One of the trips does, the Court concludes --- the last one, the one from 2019.

That trip was (i) "related" to the current breach of contract claim against the Florida CEO, and (ii) by traveling here in 2019, the Florida CEO directed his activities to New Jersey. See generally Part II.[13]

---

[12] Some of those deliveries involved pick-ups or drop-offs in other states, too. See Invoices 180-193.

[13] The Florida CEO argues that none of his New Jersey trips can count. The trips were not personal. They were work trips, made for the Logistics Company. And here, the argument goes, the New Jersey Company seeks jurisdiction over the Florida CEO --- himself, personally. See Defendant's Brief at 18-19. Spotlighting this supposed mismatch is to invoke the "fiduciary shield doctrine." But that doctrine has essentially been rejected by the Supreme Court. See Calder v. Jones, 465 U.S. 783, 790 (1984); Keeton v. Hustler Mag., Inc., 465 U.S. 770, 781 n.13 (1984). Here and there, some courts have continued to apply a watered-down version of the doctrine. See, e.g., Collins v. James W. Turner Constr., Ltd, 2017 WL 210236, at *8

### 1. Related

To check the "related" box on a breach of contract claim, a defendant's in-state activities must be tightly-enough connected to the particular contract being sued over. See Vetrotex Certainteed Corp. v. Consol. Fiber Glass Prods. Co., 75 F.3d 147, 153 (3d Cir. 1996); see also RAR, Inc. v. Turner Diesel, Ltd., 107 F.3d 1272, 1277-78 (7th Cir. 1997); CEM Corp. v. Pers. Chemistry, AB, 55 F. App'x 621, 624 (4th Cir. 2003).

Here, that contract is the guaranty the Florida CEO allegedly gave in 2025. See Complaint ¶¶ 18, 33.

But the 2015 and 2017 trips have no meaningful connection to the guaranty.

Those trips came ten years and eight years before any guaranty was made. So they are far afield.

And recall that the guaranty was linked to the New Jersey Company's deliveries for Sephora (the client of the Logistics Company at the time). See Complaint ¶¶ 9, 18, 33.

But the 2015 trip was general --- an early get-to-know-each-other meeting, to see if the Logistics Company and the New Jersey Company might opt to do business together. No real connection to Sephora there.

---

(D.N.J. Jan. 18, 2017). But most circuit courts treat the doctrine as a dead letter. See, e.g., Urquhart-Bradley v. Mobley, 964 F.3d 36, 45-47 (D.C. Cir. 2020); Glob. Commodities Trading Grp., Inc. v. Beneficio de Arroz Choloma, S.A., 972 F.3d 1101, 1110 (9th Cir. 2020); Newsome v. Gallacher, 722 F.3d 1257, 1276 (10th Cir. 2013); Hardin Roller Corp. v. Universal Printing Mach., Inc., 236 F.3d 839, 842 (7th Cir. 2001); cf. Columbia Briargate Co. v. First Nat'l Bank in Dallas, 713 F.2d 1052, 1055-1058 (4th Cir. 1983). And in a nonprecedential opinion, the Third Circuit gestured in that same direction. See FlagHouse, Inc. v. ProSource Dev., Inc., 528 F. App'x 186, 189 & n.4 (3d Cir. 2013); but cf. MoneyGram Payment Sys., Inc. v. Consorcio Oriental, S.A., 65 F. App'x 844, 850 (3d Cir. 2003) (indicating that a defendant's trip to the forum state did not count because it was made in his corporate capacity). The Court's view: the fiduciary shield doctrine is no longer good law. So the Florida CEO's argument based on it cannot work.

As for the 2017 trip, it was focused on sneakers and industrial equipment. See Gineris Deposition at 31:18-32:2. Nothing to do with Sephora. And no surprise on that --- as of 2017, the Logistics Company was still years away from lining up Sephora as a client. See id. at 39:3-25.

In short: the Florida CEO's 2015 trip and his 2017 trip were not "related" to the guaranty he allegedly offered in 2025. So those trips cannot count.

* * *

But the 2019 New Jersey trip is different.

The alleged 2025 guaranty was not negotiated and agreed to during the 2019 trip --- if it were, the trip would plainly count as a tie to New Jersey for the purpose of establishing jurisdiction here. See George Young Co. v. Bury Bros., Inc., 2004 WL 1173129, at *4 (E.D. Pa. Apr. 2, 2004).

But that is not the only sort of contact that can count.

An (a) earlier business dealing[14] can count as a jurisdictional contact for (b) a claim based on a later agreement[15] --- where there is a continuous, unbroken link between (a) and (b); and where (b), the agreement, grew out of (a), the earlier business dealing. See Control Screening LLC v. Tech. Application & Prod. Co. (Tecapro), HCMC-Vietnam, 687 F.3d 163, 168 (3d Cir. 2012); Vetrotex, 75 F.3d at 153; Koff v. Brighton Pharm., Inc., 709 F. Supp. 520, 526 (D.N.J. 1988).[16]

All of that is this case.

Between the 2019 business trip and the 2025 guaranty --- there was no rupture in the business relationship between the New Jersey Company and the Florida CEO. They worked on the sneaker and industrial-equipment accounts. See Giampaglia Declaration ¶¶ 10-11. In 2021, they teamed up to facilitate other sorts of deliveries to a department store. See id. ¶ 12. They went back

---

[14] Like the 2019 trip.

[15] Like the claim here, for breach of contract based on the 2025 alleged guaranty.

[16] The Court expresses no view on whether earlier dealings can count in other circumstances.

and forth on emails at a steady clip. See Interrogatories at pages 3-6. And they called each other. See id. at pages 3-4.

In short, the 2019 business trip and the 2025 alleged guaranty were knitted together --- by active and continuous work together.

And the 2025 guaranty meaningfully grew out of the 2019 business trip.

The specific purpose of the 2019 business trip was to set things up so that the Logistics Company and the New Jersey Company could link up to get Sephora products delivered. See Generis Deposition at 39:3-9; Complaint ¶¶ 9, 11, 18-32; Invoices at 117-132. And the 2025 alleged guaranty was an effort to keep precisely that line of business flowing --- it concerned deliveries to Sephora. See Complaint ¶¶ 9, 11, 18, 33; Giampaglia Declaration ¶ 3; Plaintiff's Brief at 14.

It can sometimes be hard to draw a clean through line, "to say exactly which past dealings [relate to] a specific [contract]." RAR, 107 F.3d at 1278.

But not here.

The 2019 New Jersey trip was specifically focused on getting Sephora comfortable using the New Jersey Company to service its deliveries.

And the 2025 alleged guaranty was about keeping those same Sephora deliveries flowing --- by overcoming any hesitation the New Jersey Company may have had about continuing to make deliveries because the Logistics Company was getting behind on its payments.

In a nutshell, the 2019 trip and the current breach of contract claim against the Florida CEO are related to each other.[17]

---

[17] The Third Circuit has long held that the "related" inquiry folds a proximate cause requirement into the mix. See Danziger, 948 F.3d at 130. Whether the tie between the 2019 visit and 2025 guaranty would be tight enough to meet a proximate cause test --- that does not need to be taken on here, because no one raises the issue. (Maybe because some courts have concluded that the Third Circuit's proximate cause requirement did not survive the Supreme Court's decision in Ford Motor, 592 U.S. at

## 2. Purposeful Availment

The Florida CEO's 2019 New Jersey trip is in play as a possible jurisdictional contact. See Part III.A.1.

But to count, a second box must also be checked --- the contact has to have involved "some . . . purposeful[] avail[ment]" by the Florida CEO of "the privilege of conducting activities within [New Jersey]." Ford Motor, 592 U.S. at 358; see also Caduceus, Inc. v. Univ. Physician Grp., 713 F. Supp. 3d 30, 36 (D.N.J. 2024).

It did, the Court concludes.

Traveling to a state, as the Florida CEO did in 2019, can help clear the purposeful-availment bar. See Telcordia Tech Inc. v. Telkom SA Ltd., 458 F.3d 172, 177 (3d Cir. 2006); see also Burger King Corp. v. Rudzewicz, 471 U.S. 462, 476 (1985) (dicta).

And all the more so where, as here, the purpose of traveling to the state was to kick off a business relationship that would --- and did --- involve years of active, hands-on work being done in the state, of trucks moving Sephora product on roads in New Jersey. See generally Burger King, 471 U.S. at 475 n.18 (focusing on the "nature and quality and the circumstances" associated with a contact).

* * *

In sum, the Florida CEO's 2019 trip to New Jersey counts as a jurisdictional contact here.

Therefore, it starts the needle moving in the direction of the Court exercising jurisdiction over the CEO in connection with his alleged 2025 guaranty.

Does the trip, standing alone, move the needle far enough, all the way down the dial? Maybe, maybe not.

---

366. See generally Rickman v. BMW of N. Am. LLC, 538 F. Supp. 3d 429, 442 (D.N.J. 2021) (so holding); see also Barnett v. United Airlines, 2026 WL 465980, at *5 (D.N.J. Feb. 2, 2026) (following Rickman), report and recommendation adopted, 2026 WL 461605.)

But that question does not need answering. Because there is another jurisdictional contact, too. It is discussed in the next section.

**B. The Phone Call**

Take on here the next alleged New Jersey contact --- the guaranty that the Florida CEO allegedly gave. See Interrogatories at pages 3-4; Plaintiff's Brief at 5, 16.

* * *

Per the New Jersey Company, the guaranty was offered up as follows.

In early 2025, the New Jersey Company was wrapping up some Sephora deliveries. See Complaint ¶¶ 9, 18-22; Invoices at 117-136. But it was still owed some payments --- and the Logistics Company was behind on making them. See Complaint ¶¶ 18-22; March Emails at 15-17.

So the New Jersey Company's president called the Florida CEO to see what was going on. See Interrogatories at pages 3-4.

The Florida CEO answered. See id. During that phone call, the Florida CEO allegedly indicated that he would "ensure that [the New Jersey Company] would be compensated for the [Logistics Company's] unpaid invoices." See id.; Complaint ¶ 33.[18]

[18] The Florida CEO swears that that this phone call never happened. See Gineris Deposition at 56:1-57:18. And he also argues that the New Jersey Company's evidence as to what happened on the phone call is not specific enough to establish that a guaranty was given. See Defendant's Reply Brief at 2-4. But for now, the Court will proceed on the assumption that the call was made and that the New Jersey Company has its substance right. Two reasons why. First, the did-the-phone-call-happen question and the did-the-alleged-words-amount-to-a-valid-guaranty question --- these are the key merits disputes here. Those questions are to be resolved the way merits questions always are. By a Rule 12 failure-to-state-a-claim motion. A Rule 56 summary judgment motion. Or by the jury. These merits questions are not for the Court to dispose of now, via a jurisdictional motion. See Montgomery v. Hoffmann-La Roche, Inc., 2012 WL 3020354, at *3 (E.D. Pa. July 24, 2012) ("Courts must be wary about converting a jurisdictional inquiry into an

After the phone call, and for around a month, the New Jersey Company continued making Sephora-related deliveries for the Logistics Company. See Invoices 117-193; Complaint ¶¶ 9, 18, 33. All of this even as no payment came in. See Complaint ¶ 19.

* * *

In light of the above, move now to two questions.

---

inquiry on the merits."); cf. Davis v. Wells Fargo, 824 F.3d 333, 348 (3d Cir. 2016) (directing "district court [to] take care not to reach the merits of a case" when deciding if there is subject matter jurisdiction). And a second point. The apparently sharp factual dispute as to the call and its content will likely take a good deal of evidence to resolve. Assessing diametrically different bits of testimony from two people as to whether they spoke and what they said --- that is sometimes the stuff of a quick evidentiary hearing, of simply squinting hard as the relevant people testify and deciding who is more likely telling the truth. But not here. Determining as a factual matter whether the call happened (and if it did, what happened on it) will likely require a broader look at the alleged callers' relationship, and their companies'. For example, based on prior dealings --- is it sensible to think that, in the absence of a guaranty, the New Jersey Company would have kept on making deliveries for the Logistics Company, as it did? Had there been rocky times before? Then, had there been talk of the Florida CEO going on the hook personally? Were there shifts in the substance of the parties' relationship after the guaranty was allegedly offered and after it was allegedly breached? Bottom line: the disputed factual questions here are not only merits questions --- they are merits questions that may take something approaching a trial's worth of evidence to resolve. After jurisdictional discovery, the Court has discretion as to whether to hold an evidentiary hearing. See, e.g., Pinto v. St. Paul Fire & Marine Ins. Co., 674 F. Supp. 3d 176, 181 (E.D. Pa. 2023); 5B Wright & Miller Fed. Prac. & Proc. § 1351 (4th ed. 2026). Here, the Court will opt not to hold one. So as not to resolve merits questions now. And also to avoid taking an almost-trial's worth of evidence to decide if there is jurisdiction in the first place. The Court credits, for now, the New Jersey Company's evidence that the Florida CEO made a personal guaranty on the phone call. Whether he actually did, that is a question for later.

First, did the Florida CEO understand his part of the alleged 2025 phone call to be tied in some way to New Jersey?

And if yes, a second question: can the 2025 phone call count in this particular case --- for establishing jurisdiction over the Florida CEO on the breach of contract claim against him?

### 1. A New Jersey Contact?

The first question: was the alleged 2025 phone call sufficiently linked to New Jersey?

Yes, the Court concludes.

The only reasonable inference is that when the Florida CEO picked up the call from the president of the New Jersey Company, the Florida CEO understood himself to be directing his own part of the call to New Jersey and to work to be done in the state.

After all, the company on the other side of the line had New Jersey written all over it. New Jersey incorporated, New Jersey headquartered, and mostly New Jersey deliveries. See Giampaglia Declaration ¶ 6; Invoices 117-193.

And none of this was obscure to the Florida CEO. He had traveled to the New Jersey Company's facilities in New Jersey. See Gineris Deposition at 19:18-20:25. The delivery accounts that the Florida CEO worked on with the New Jersey Company were centered in New Jersey. See id.; Giampaglia Declaration ¶¶ 3-14; Invoices 117-193. The Florida CEO exchanged emails with the New Jersey Company's president whose signature block had a New Jersey address. See March Emails 15-17. All of the Florida CEO's in-person contacts with the New Jersey Company's employees appears to have occurred in New Jersey. See Gineris Deposition at 19:18-20:25; Giampaglia Declaration ¶¶ 3-14; March Emails 15-17. And the work number of the New Jersey Company's president had a New Jersey area code. See March Emails at 17.

In short, the 2025 call must be chalked up as a New Jersey contact.

* * *

Against this conclusion, the Florida CEO's best counterargument: maybe the New Jersey Company's president was at one of his company's out-of-state satellite offices during the alleged phone call. See Defendant's Brief at 21 n.9.

Perhaps. But why treat that bit of speculation as anything approaching an odds-on possibility?

And in any event, personal jurisdiction is generally concerned (among other things) with ensuring that the defendant has "fair warning" that a "particular activity may subject [him] to the jurisdiction of a [different state]." Ford Motor, 592 U.S. at 360. So what matters here is what the Florida CEO understood himself to be doing when he picked up the phone and allegedly gave his guaranty --- not whether his interlocutor happened to be at a satellite office.[19]

Moreover, the New Jersey Company's president was acting as an agent for his Company during the relevant 2025 phone call. And communications sent to an agent are generally understood as being directed to the state where the principal is based. See Inamed Corp. v. Kuzmak, 249 F.3d 1356, 1360 (Fed. Cir. 2001); Akro Corp. v. Luker, 45 F.3d 1541, 1546 (Fed. Cir. 1995) (same). Here, that is New Jersey. See Giampaglia Declaration ¶ 6.

And finally, note that no evidence has been put before the Court that the Florida CEO had any reason to be thinking satellite office --- or that he even knew one existed.

---

[19] See Mucha v. Wagner, 378 N.C. 167, 173 (2021) (finding in the phone call context that "a defendant's awareness of the connection between [his] conduct . . . and the forum state" is what matters); cf. Walburn v. Rovema Packaging Machs., L.P., 2008 WL 852443, at *6 (D.N.J. Mar. 28, 2008) (phone call to a plaintiff in New Jersey did not count as a New Jersey contact because the defendant "believed" the plaintiff to be somewhere else); Proud Veterans, LLC v. Ben-Menashe, 2014 WL 791200, at *8 (D. Kan. Feb. 27, 2014) (holding that a phone call to the plaintiff in the forum state did not help establish personal jurisdiction because the defendant "did not know [the plaintiff] to be in [the forum state]"); see generally IMO Indus., Inc. v. Kiekert AG, 155 F.3d 254, 260 n.3 (3d Cir. 1998) (indicating that even a communication "sent to a third-party outside the forum" can count as a forum contact where it would "foreseeably" wind up affecting the forum); Bernardi Bros. v. Pride Mfg., Inc., 427 F.2d 297, 299 (3d Cir. 1970) (characterizing a jurisdictional contact as one that is "calculated to have an effect in the forum state") (cleaned up); Patchen v. McGuire, 2012 WL 4473233, at *9 (E.D. Pa. Sept. 27, 2012).

Instead, the evidence points in the opposite direction: that the Florida CEO was likely focused on New Jersey and work in New Jersey when this personal guaranty was allegedly offered up by him during this phone call. See Thomas v. Skrip, 876 F. Supp. 2d 788, 796-97 (S.D. Miss. 2012); cf. Associated Producers, LTD v. Vanderbilt Univ., 76 F. Supp. 3d 154, 164-65 (D.D.C. 2014).

Bottom line: the Florida CEO's counterargument does not work, and the 2025 phone call adds up to a New Jersey contact.

**2. A Contact for the Breach of Contract Claim?**

Now to the second question: does the 2025 phone call, a New Jersey contact, see Part III.B.1, weigh in favor of jurisdiction here in New Jersey over the Florida CEO on the breach of contract claim against him?

That is a matter, as before, of working through the "related" analysis and the "purposeful availment" analysis.

**a. Related**

The 2025 phone call is related. Plainly. The breach of contract claim as to the Florida CEO is about a guaranty. And it was on the phone call that the guaranty was allegedly offered up. See Interrogatories at pages 3-4; Plaintiff's Brief at 5, 16.

**b. Purposeful Availment**

What about the purposeful availment aspect of things? See generally O'Connor, 496 F.3d at 317.

This is less straightforward. Because the question is whether "the defendant deliberately . . . enter[ed] [into] a contractual relationship centered [in the forum state]." Ford Motor, 592 U.S. at 359 (emphasis added).

And an agreement (here, the alleged 2025 guaranty) is not "centered" in a state (here, New Jersey) just because one of the contracting parties (here, the New Jersey Company) is based there. See Burger King, 471 U.S. at 478; Mellon Bank (E.) PSFS, Nat. Ass'n v. Farino, 960 F.2d 1217, 1223-24 (3d Cir. 1992); Arkansas Rice Growers Co-op. Ass'n v. Alchemy Indus., Inc., 797 F.2d 565, 573 (8th Cir. 1986); Bond Leather Co. v. Q.T. Shoe Mfg. Co., 764 F.2d 928, 930 (1st Cir. 1985).

But in this case, there is more than that. Tick through four ways in which this is so.

* * *

First, the alleged guaranty agreement was made[20] on a single New Jersey-linked[21] phone call. Any negotiation that might have happened --- it happened on that New Jersey call. And any concrete agreement-to-be-bound also could only have happened on the New Jersey call. The place where a deal is finally struck, and the place where it is negotiated --- those tilt the scale in the "purposeful availment" direction. See, e.g., Control Screening, 687 F.3d at 168 (agreeing); Mellon Bank, 960 F.2d at 1223 (negotiating); Caduceus, 713 F. Supp. 3d at 37 (same).

* * *

Second, there is ample evidence that the Florida CEO knew that with the 2025 alleged guaranty he was making an agreement with a company (the New Jersey Company) that was based in New Jersey and that did much of its work here. See Mellon Bank, 960 F.2d at 1223-24 (as to the significance of this); Remick v. Manfredy, 238 F.3d 248, 256 (3d Cir. 2001) (same); see also Nat'l Can Corp. v. K Beverage Co., 674 F.2d 1134, 1138 (6th Cir. 1982).

* * *

Third, the alleged guaranty helped keep business flowing into the forum state (New Jersey) in order to keep money flowing back to the guarantor (the Florida CEO). See Bond Leather, 764 F.2d at 933-34 (explaining the significance of this); Nat'l Can Corp., 674 F.2d at 1137 (same); Granada Apartment Holdings, LLC v. Joseph, 2019 WL 698303, at *4-5 (W.D. Pa. Feb. 20, 2019) (same); Koff, 709 F. Supp. at 526 n.7 (D.N.J. 1988) (same); cf. Mellon Bank, 960 F.2d at 1225 n.4.

The Florida CEO here was no passive bystander --- not a distant guarantor, supplying a back-up promise akin to the kind of impersonal guaranty supplied by an insurance-company contract.

---

[20] Assuming for present purposes it was. See footnote 18.

[21] See Part III.B.1.

Rather, the Florida CEO had real skin in the game --- at the time of the alleged phone call, he was the majority shareholder of his Logistics Company. See Gineris Declaration ¶¶ 6-7.

So when his Logistics Company was allegedly lurching here and there and struggling to get out its payments, see Complaint ¶¶ 11, 18-32, the Florida CEO had a financial incentive to offer a guaranty --- to keep the New Jersey Company on board, so that it would keep making Sephora deliveries throughout New Jersey for the Florida CEO's Logistics Company, an outcome that would directly benefit him.

The Florida CEO had a solid reason to "exploit the local [New Jersey] economy," Bond Leather, 764 F.2d at 934, and with his guaranty he was able to keep on doing just that. So this also leans the balance in the "purposeful availment" direction.

* * *

Fourth, as in any breach of contract case, it matters where the underlying contract, the guaranty, was to be performed. See Control Screening, 687 F.3d at 168; Remick, 238 F.3d at 257.

The place a guaranty is to be performed is a combination of things.[22]

In part, a guaranty is performed where, if it comes to it, the money will be sent. See Mellon Bank, 960 F.2d at 1223-24 (suggesting this).

Here, that place was New Jersey. If the Logistics Company could not cover what it owed to the New Jersey Company, the Florida CEO would have to make a payment to the New Jersey Company.[23]

And in part, a guaranty is performed in the place of performance on the underlying contract, the one being guaranteed --- the contract whose performance was presumably intended to be induced by the guaranty. See Mellon Bank, 960 F.2d at 1223-24; Henry L. Firm v. Cuker Interactive, LLC, 950 F.3d 528, 533 (8th Cir.

---

[22] Two pieces of the puzzle are listed out in the text. In other cases, others might be relevant, too.

[23] All of the invoices that were filed with the Court show that the New Jersey Company expected payments to be sent to its New Jersey address. See Invoices at 117-193.

2020); Nat'l Can Corp., 674 F.2d at 1138; Marathon Metallic Bldg. Co. v. Mountain Empire Const. Co., 653 F.2d 921, 923 (5th Cir. 1981).

Here, that place is again New Jersey. The guaranty was related to the work the New Jersey Company was doing for the Logistics Company in New Jersey.[24] See Invoices at 117-193; Giampaglia Declaration ¶¶ 3-14; Gineris Deposition at 24:1-25.

* * *

In sum, the 2025 New Jersey-linked phone call was related to the breach of contract claim here --- because that call is where the alleged agreement (the guaranty) was struck. See Part III.B.2.a. And via the 2025 phone call, the Florida CEO purposefully availed himself of the privilege of doing business in New Jersey, for the four reasons laid out above. See Part III.B.2.b.

So for the breach of contract claim against the Florida CEO, the 2025 phone call counts as a jurisdictional contact with New Jersey.[25]

## C. Conclusion

As to the breach of contract claim, the relevant contacts with New Jersey are (i) the Florida CEO's 2019 trip, see Part III.A, and (ii) the 2025 phone call where the guaranty was allegedly given. See Part III.B.

---

[24] Recall that some of the delivery jobs involved pick-ups or drop-offs in other states. See Invoices 180-193. But nearly every delivery job involved either a pick-up or a drop-off in New Jersey. And most often, both occurred in New Jersey. See id.

[25] Note that after relatedness and purposeful availment are considered, there is a third prong of the test --- a kick of the tires for fairness. See O'Connor, 496 F.3d at 317. But where, as here, the relatedness and purposeful availment hurdles have been cleared, "jurisdiction [is] presumptively constitutional, and the defendant 'must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable.'" Id. at 324 (quoting Burger King, 471 U.S. at 477). But the Florida CEO does not try to "present" anything along those lines. So the presumption stands.

Some cases might be taken to suggest that just (ii) would be enough to establish jurisdiction over the Florida CEO.[26]

But one way or another, (i) and (ii), taken together,[27] plainly push things over the edge. There is personal jurisdiction here over the Florida CEO on the breach of contract claim against him.

## IV. Other Claims

In addition to the breach of contract claim, the New Jersey Company presses five others --- for breach of the implied covenant (see id. ¶¶ 50-60), quantum meruit (see id. ¶¶ 61-69), unjust enrichment (see id. ¶¶ 70-78), common law fraud (see id. ¶¶ 79-88), and unlawful interference with a prospective economic advantage (see id. ¶¶ 89-95).

Of these, claims two through five here are based on essentially the same set of facts as the breach of contract claim. See Complaint ¶¶ 33, 42-88. All of the just-listed claims center around the New Jersey Company relying on the payment promises allegedly made and broken by the Florida CEO and his Logistics Company. See id.

The analysis as to these claims would be substantially similar to the breach of contract analysis above. So there is jurisdiction over those claims for essentially the same reasons there is jurisdiction over the breach of contract claim. See, e.g., B&C Luxury Auto, Ltd. v. Intex Cargo, Inc., 2023 WL

---

[26] See Nat'l Can Corp., 674 F.2d at 1137 (holding that personal jurisdiction was appropriate based almost entirely on a personal guaranty centered in the forum state); Koff, 709 F. Supp. at 526 n.7 (holding that a personal guaranty paired with a financial interest in the corporation whose obligations were guaranteed would likely be enough); Gilliland v. Hurley, 2010 WL 830968, at *3 (W.D. Pa. Mar. 4, 2010) (finding purposeful availment mainly because of a verbal agreement made over the phone with a forum-based plaintiff); cf. Mellon Bank, 960 F.2d at 1223 ("[B]y . . . offering to guaranty [the] debt, the defendants deliberately reached out beyond one state and created continuing relationships and obligations with citizens of another state[.]") (cleaned up).

[27] See Metcalfe v. Renaissance Marine, Inc., 566 F.3d 324, 335 (3d Cir. 2009) (analyzing personal jurisdiction based on the "cumulative[]" effect of a defendant's contacts).

2554682, at *4, n.4 (D.N.J. Mar. 17, 2023) (exercising personal jurisdiction over a defendant as to a fraud claim because it "ar[o]se out of the same 'series of transactions' as [the plaintiff's] contract and quasi-contract claims"); Malek v. Chef's Roll, Inc., 2019 WL 3854303, at *6 n.4 (D.N.J. Aug. 16, 2019) (similar); Quality Uptime Servs. v. Basis Sys. Inc., 2024 WL 3239632, at *6 (D.N.J. June 13, 2024) (similar), report and recommendation adopted, 2024 WL 3226998; see generally O'Connor, 496 F.3d at 318 n.3

* * *

But the sixth claim, for unlawful interference, is different.

That claim centers on a restrictive covenant that barred the New Jersey Company from working directly with Sephora (the Logistics Company's client at the time). See Complaint ¶¶ 89-95. The allegation is that, when the Logistics Company began to struggle financially, it refused to timely release the New Jersey Company from the covenant. See id. And because of that, the New Jersey Company lost out on Sephora business. See id.

But the New Jersey Company did not present any evidence as to that claim. And at this point, it can no longer rely on its pleadings alone. See Patterson ex rel. Patterson, 893 F.2d at 603-04. There is nothing in the record tying the Florida CEO in any way to a restrictive covenant decision. So there can be no basis for imputing any possible New Jersey jurisdictional contacts to him on the restrictive covenant claim. That claim, therefore, must be dismissed against the Florida CEO for lack of personal jurisdiction.

## V. Conclusion

For the reasons set out above, the Florida CEO's ECF 32 motion to dismiss for lack of personal jurisdiction is denied, except it is granted as to the restrictive covenant claim.[28]

IT IS on this 18th day of November, 2026, **SO ORDERED.**

Michael E. Farbiarz, U.S.D.J.

[28] The part of the motion seeking dismissal for failure to state a claim is denied without prejudice and can be refiled on a schedule to be set by the United States Magistrate Judge. That part of the motion has not yet been fully briefed.